Filed 7/3/24  P. v. Superior Court (J.A.) CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Petitioner,<br><br>                v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>        Respondent;<br><br>J.A.,<br><br>        Real Party in Interest. | F086099<br><br>(Super. Ct. No. 20CEJ600005-2)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Virna L. Santos, Judge.

Lisa A. Smittcamp, District Attorney, Traci Fritzler and Stephen E. Wright, Assistant District Attorneys, Kelsey C. Peterson, Deborah Miller and Kendall T. Reynolds, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Alternate Defense Office and Gregory Gross and Anjali A. Bansal for Real Party in Interest.

Munger, Tolles & Olson LLP, Jeffrey Y. Wu, Adeel Mohammadi, and Wesley P. DeVoll, for Amicus Curiae Pacific Juvenile Defender Center, for Real Party in Interest.

-ooOoo-

## INTRODUCTION

In 2021, a juvenile wardship petition was filed against J.A. alleging he had committed, in part, murder and attempted murder when he discharged a firearm. J.A. was just under 17 years old when his alleged crimes occurred.

The prosecution moved to transfer J.A. to adult criminal court. After a lengthy contested transfer hearing, the juvenile court ruled that the prosecution had failed to meet its burden by clear and convincing evidence that J.A. was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

Petitioner filed a petition for writ of mandate in this court asking us to vacate the transfer order and direct the juvenile court to grant the motion and order J.A.'s case to proceed in adult court.

We reject petitioner's arguments that the juvenile court abused its discretion. We deny the petition for writ of mandate.

## BACKGROUND

We summarize the material facts. We provide additional details later in this opinion when relevant to the issues which petitioner raises.

### I. The Shooting.

Just prior to the transfer hearing, the prosecution established by a preponderance of the evidence that J.A. had committed the alleged crimes.[1] We summarize that evidence.

---

[1] In response to a transfer motion, a minor may challenge the sufficiency of the evidence establishing that he committed the alleged offenses. The People must make a prima facie showing based on a preponderance of the evidence that the minor committed the crime. (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186, fn. 8; see *Edsel P. v. Superior Court* (1985) 165 Cal.App.3d 763, 784; California Rules of Court, rule

This fatal shooting occurred in the City of Fresno at about 1:11 a.m. on January 3, 2021. At that time, J.A. was 16 years 11 months old. J.A. is a member of the West Fresno Norteño criminal street gang.

On the night in question, J.A. was armed with a firearm. He was walking with a friend, a fellow gang member. They were going to a party. While outside, they encountered a male, I.L, who was 15 years old. Several female minors, including Breanna Gomez, were near I.L. I.L. was a member of a subset of the Bulldogs criminal street gang, which is a rival of J.A.'s gang. There is no evidence that J.A. knew either Breanna or I.L. prior to this shooting.

As the two groups came near each other, no words were exchanged. J.A.'s friend later told law enforcement that I.L. put his hand near his waistband and I.L. appeared to be reaching for something. In an apparent response, J.A. drew his firearm and he fired multiple times. Breanna was struck and she subsequently died from a single gunshot that caused extensive internal damage. She was 14 years old.

I.L. fell to the ground. J.A. stood over I.L. and he repeatedly fired until he emptied his magazine. Although struck about six times, I.L. survived.

J.A. fled with the firearm in his hand. He called his mother, who picked him up and drove him away from the area. Within days of this shooting, J.A.'s mother took J.A. to the state of Washington.

Law enforcement determined that J.A. used a .40-caliber gun during this incident and he fired his gun 11 times. There is no evidence that law enforcement ever recovered the .40-caliber handgun used in this matter.

Law enforcement discovered that I.L. had a gun in his waistband when this fatal encounter occurred. However, his gun did not have a magazine. Subsequent testing

5.766(c).) This is known as an " 'Edsel P. hearing.' " (Kevin P. v. Superior Court, at p. 186, fn. 8.) An Edsel P. hearing may be held jointly with the transfer hearing. (Kevin P. v. Superior Court, at p. 186, fn. 8.)

established that I.L.'s gun did not meet the definition of a "firearm" because the barrel had obstructions that prevented it from discharging a projectile. I.L. denied to law enforcement that he ever pulled out his gun before J.A. fired.[2]

On August 4, 2021, J.A.'s friend told law enforcement that J.A. had been the shooter during this incident. According to that friend, J.A. had said he fired because he thought I.L. was going to shoot his (J.A.'s) friend. That friend also told law enforcement that, after this shooting, J.A. sold his .40-caliber gun to another gang member.

On August 6, 2021, J.A. and his mother were both arrested for their involvement in this fatal shooting.

## II.     The Juvenile Petition.

On August 10, 2021, petitioner filed a juvenile wardship petition against J.A., alleging that he committed murder (Pen. Code, § 187, subd. (a); count 1), attempted murder (Pen. Code, §§ 664/187, subd. (a); count 2), and assault with a firearm (Pen. Code, § 245, subd. (a)(2); count 3). Firearm enhancements (Pen. Code, §§12022.53, subd. (d), 12022.5, subd. (a)) and great bodily injury enhancements (Pen. Code, § 12022.7, subd. (a)) were alleged.

Petitioner did not charge J.A. with any gang-related charges or enhancements.

## III.    The Transfer Hearing.

In January 2023, petitioner moved the juvenile court for an order transferring J.A. to adult criminal court.

In March and April 2023, the juvenile court conducted a contested transfer hearing over multiple days. At that time, J.A. was just over 19 years old.

We summarize the material evidence from the transfer hearing.

---

[2]     At the conclusion of the transfer hearing, the prosecutor admitted to the juvenile court that there was information about I.L. "reaching towards his waistband" but, according to the prosecutor, that did not justify the "overkill" that happened.

## A. J.A.'s Childhood.

J.A.'s parents separated before he was born, and he was primarily raised by his grandparents between the ages of two and nine. J.A. did not have a close relationship with his father.

J.A.'s mother was a validated member of the Fresno Bulldogs criminal street gang. Throughout J.A.'s early life, she was repeatedly incarcerated. In 2008, she was sentenced to prison for five years for her participation as an accessory in a murder involving multiple codefendants. She also has a misdemeanor conviction for violating Health and Safety Code section 11364.1, subdivision (a).

Child Protective Services (CPS) memorialized numerous contacts it had with J.A. over the years. In general, the CPS reports show that, during his childhood, J.A. was exposed to a chaotic lifestyle with his mother in and out of his life. He witnessed his mother commit domestic violence. He saw her appear "high" and under the influence of drugs. When he was about 12 years old, J.A. found methamphetamine in a backpack his mother had used. With CPS present, she admitted to using drugs again. J.A. began to cry and was upset with his mother for lying to him. J.A. reported to CPS that his mother lies to him "all the time and he wants her to change."

When he was about 13 years old, J.A. joined the Norteños, which are rivals of the Bulldogs. A defense expert, Marcel Woodruff, opined to the court that J.A. joined a rival gang because his mother was a Bulldog.

While in juvenile custody for the present charges, J.A. found out that his mother had lied to him about the identity of his real father. J.A. told one of the defense experts that his mother "was the architect of all the misery" in his life, and she had "betrayed him" again. The juvenile court noted for the record that it saw firsthand how the revelation about his father had deeply affected J.A., causing the court to order psychological services for him.

### B.    J.A.'s behavior while in juvenile custody.

The evidence demonstrates that, in general, J.A. was doing well while in custody. Since his arrest in this matter, he had graduated from high school. He had enrolled in a college course.

J.A. was participating in various programs, and he had received awards for his participation. At one point, J.A. was student of the month within his pod.

According to one of the juvenile facilitators, J.A. was generally respectful and he understood the curriculum. The facilitator recalled that, on one occasion, J.A. was "horseplaying" and he had to be told to stop messing around. J.A. stopped and apologized.

While in juvenile custody and participating in programs, steps were taken to keep J.A. separated from rival gang members.

### C.    The testimony from the probation officer.

A probation officer recommended to the juvenile court that J.A. should be transferred to the jurisdiction of the adult criminal court.[3] In preparing his report, the probation officer did not interview J.A. He also did not review various assessments of J.A. which were conducted by defense experts.

The probation officer was aware that J.A.'s mother was incarcerated when J.A. was about two or three years old. The probation officer had access to the CPS reports regarding J.A.'s childhood, but he did not review them.

The probation officer opined to the juvenile court that J.A.'s rehabilitative needs "surpass the available resources" in the juvenile system. However, in court, the officer admitted that he did not know what services were offered to youth in the County's

---

[3]    When resolving a motion to transfer a minor to adult criminal court, the Welfare and Institutions Code directs a juvenile court to consider the probation officer's report and any other relevant evidence that the petitioner or minor may wish to present. (Welf. & Inst. Code, § 707, subd. (a)(3).)

"Secure Track."[4] The officer also admitted in court that he did not know what J.A. needed in order to rehabilitate.[5]

### D. The testimony from the defense experts.

The defense elicited testimony from two experts regarding J.A.'s potential for rehabilitation. The experts, Marcel Woodruff and Carolyn Murphy, separately met with J.A. They separately opined to the court that J.A. could be rehabilitated.

#### 1. Woodruff's testimony.

Woodruff is a former gang member. His organization, Advance Peace, works with most gangs in Fresno. Advance Peace attempts to reduce gun violence. According to Woodruff, his organization mediates with gang elders to help a gang member leave the gang. Advance Peace has an 18-month program. It attempts to give tools to youth so they can deal with negative situations and heal from past trauma.

---

[4] Until recently, the Division of Juvenile Justice (DJJ) was "the state's most restrictive placement for its most severe juvenile offenders .…" (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902.) The DJJ is also known as "the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF)." (*In re J.B.* (2022) 75 Cal.App.5th 410, 413, fn. 1.) "The DJJ was previously known as the California Youth Authority." (*In re Miguel C.*, at p. 906, fn. 4.)

In 2020 the Legislature enacted "juvenile justice realignment" by passing Senate Bill No. 823 (2019-2020 Reg. Sess.). (Stats. 2020, ch. 337.) Implementing the Legislature's juvenile justice realignment program required the closure of DJJ and the transfer of its responsibilities onto California's counties. (Welf. & Inst. Code, § 736.5, subd. (a).) The agency formerly known as DJJ is being shuttered and, after July 1, 2021, it no longer accepts court commitments except in limited circumstances. (Welf. & Inst. Code, § 733.1.) The DJJ closed on June 30, 2023. (Welf. & Inst. Code, § 736.5, subd. (e).)

Due to the closure of DJJ, the Legislature directed counties, beginning July 1, 2021, to create "secure youth treatment facilities" for those youth who previously could have been committed to DJJ. (See, e.g., Welf. & Inst. Code, § 875.)

[5] During closing argument, the prosecutor admitted to the juvenile court that the probation officer "did not have a lot of information and did not acquire as much information as I would have liked and I think this Court would have liked .…."

Via a stipulation, the juvenile court recognized Woodruff as an expert in gang culture, gang reintegration, and gang prevention strategies. Prior to testifying in this matter, Woodruff met with J.A. to assess him. According to Woodruff, J.A. had been "identity driven" to join a gang. J.A. had suffered a lot of abandonment issues from his mother and from her participation in a rival gang. She was frequently absent from J.A.'s life. Woodruff noted that J.A. had joined his gang when he was 13 years old. According to Woodruff, J.A. had been trying to discover who he was and he was dealing with his mother's "continuous abandonment" of him. Woodruff believed J.A. had joined a rival gang to get back at his mother.

Woodruff believed J.A. had suffered trauma from his mother abandoning him. However, J.A. was reconciling with her and she was back in his life. Woodruff opined to the court that J.A. can step away from his gang with the proper tools and support system. Woodruff testified that J.A. "had a high aptitude for redirection." J.A. was interested in music and he had a positive educational experience while in juvenile detention, including graduating from high school and not causing problems.

### 2. *Murphy's testimony.*

Murphy is a clinical psychologist. The juvenile court designated her as an expert in forensic and clinical psychology. Prior to her testimony in this matter, Murphy interviewed J.A. for about 90 minutes.

According to Murphy, J.A. had suffered from numerous "adverse childhood experiences" (ACEs). These ACEs encompassed emotional abuse, physical neglect, parental separation and divorce, a criminogenic household member, household substance abuse, and some domestic violence.

Murphy diagnosed J.A. with three disorders: (1) conduct disorder; (2) a severe cannabis use disorder; and (3) a moderate alcohol use disorder. According to Murphy, J.A. was slightly below average in his verbal processing skills. His intellect was average.

8.

According to Murphy, J.A.'s mother was a validated member of the Bulldogs criminal street gang. Murphy did not think it was surprising that J.A. went down the gang path. Murphy opined that J.A.'s gang activity was "significantly influenced" by his mother. Murphy opined that J.A. is amenable to treatment while under the jurisdiction of the juvenile court. She saw no evidence that he was "irredeemable."

### 3. Will Muhammad's testimony.

Another former gang member, Will Muhammad, testified at the transfer hearing. Muhammad has 12-week curriculum to assist juvenile gang members.

Muhammad had previously worked with Norteños. Muhammad testified that all gang members have a common thread of prior trauma and negative environments. His program works with youth to address their trauma and develop coping skills. He told the court that his program is successful if he can get an individual "to think differently." He attempts to help a youth understand his past and how to move away from negative behaviors.

### E. J.A.'s four recorded calls while in custody.

While he was in custody, J.A. made certain phone calls to his mother, which were recorded. Four calls became crucial at the transfer hearing. In each of the calls, J.A. asked his mother to connect him to an apparent gang member. In each instance, J.A.'s mother complied. The three later calls occurred while this transfer hearing was underway. J.A. made these calls after he had been in custody for about 19 months.

We summarize the four recorded phone calls.

### 1. The first call on March 8, 2023.

On March 8, 2023, J.A. called his mother. During that call, he asked her if she could connect him to "George." She tried, but was unable to reach him. J.A. asked if he could speak with "Alex." His mother was able to connect Alex to their call. It is apparent from the context of the call that Alex is associated with J.A.'s gang.

J.A. asked Alex to speak with the gang's "big homie" to see if J.A. could get "a green light" to testify in his own defense. J.A. made it clear that he did not want to be seen as a "snitch" if he testified. J.A. said he was not going to provide any "names" while he testified, and he would only explain what had happened. J.A. told Alex that, if he could tell his version of events, he would be able to go home.

After asking Alex to seek a green light on his behalf, J.A. rapped a song for Alex. In his rap, J.A. stated, "Norte is how I'm thuggin'." Alex exited the call. J.A. told his mother that he loved her and he was going to read the bible.

### 2. The second call on March 13, 2023.

On March 13, 2023, J.A. called his mother. After exchanging pleasantries, he asked her to connect him with "George." It is apparent from the context of the call that George is associated with J.A.'s gang.

George told J.A. about an apparent gang-related fight that he (George) had participated in. According to George, he severely beat the other individual, including stomping on his head.

### 3. The third call on March 15, 2023.

On March 15, 2023, J.A. called his mother. After a brief exchange, he asked her to call George. J.A. told George generally about the progress of his case. J.A. told George that he wanted to go to trial so he could "bounce out" and then "just be thugging." J.A. thought that might happen "next month." J.A. indicated that he wanted to sell marijuana ("tree") for a little bit when he was out. J.A. also indicated that he wanted to go to the Department of Motor Vehicles (DMV) to get his license.

### 4. The fourth call on March 20, 2023.

On March 20, 2023, J.A. called his mother. During this call, his mother connected him to "Sydney." After talking for a little while, J.A. rapped a song. In part, J.A. rapped that he would "die about these five letters, N-O-R-T-E." After finishing his song, J.A. said, "We going to go stupid on the outs real soon man."

10.

### F. Woodruff's Reactions to the Recorded Calls.

During the transfer hearing, Woodruff (the gang expert for the defense) was asked about J.A.'s four recorded calls. Woodruff believed that the first call from March 8 showed that J.A. was "courageous" in seeking to go against the gang and advocate for himself. Woodruff explained that J.A. could be considered a snitch if he testified. According to Woodruff, asking a fellow gang member to talk to the "big homies" was the appropriate route. Woodruff believed that this showed J.A. has potential for "stronger conversations in the future" if he received services, support and coaching.

Woodruff also noted that J.A. rapped in the March 8 call. Woodruff believed that music could be an anchor in J.A.'s life. Woodruff told the court that rapping about violence does not mean the singer is expressing a personal intent.

For the March 13 call, Woodruff noted that the other caller talked about getting in a fight. During the call, J.A. had expressed some understanding about why the gang fight had occurred. Woodruff stated that J.A. is a full-fledged and "committed" member of the Norteño gang. According to Woodruff, it was not unusual for J.A. to present as a Norteño and show excitement when hearing about gang activities.

For the March 15 call, Woodruff noted that J.A. was talking about getting his driver's license. According to Woodruff, this showed that J.A. was thinking about what he needed to do to be "legit" on the outside. J.A. also talked about selling marijuana, which is common. Woodruff believed that this demonstrated J.A.'s lack of an economic plan. Woodruff explained that programs exist to help J.A. earn money. Woodruff agreed that J.A. may have only been performing tasks while in custody simply to obtain his release. However, Woodruff also explained that J.A. needed coaching to help him imagine something bigger.

For the March 20 call, Woodruff acknowledged that J.A. had rapped about being a Norteño. Woodruff opined that this showed J.A. cannot "self-differentiate himself from

11.

the gang" because he is identity driven. Woodruff explained that J.A. needs interventions to tether himself to new anchors for his identity.

Woodruff told the court that J.A. "had a high aptitude for redirection." The recorded phone calls did not change Woodruff's opinions about J.A. Woodruff explained that J.A. is encapsulated and committed to the Norteño gang at this time, which Woodruff believed was normal. Woodruff testified that it is common for someone to relapse but tools and training can help with coping. Woodruff did not view J.A. as just going through the motions to get out of custody.

### G. The disputed evidence regarding prior efforts to rehabilitate J.A.

Evidence was introduced at the transfer hearing that showed J.A. has a history of possessing various firearms. In January 2020, he was in possession of a sawed-off shotgun just before he turned 16 years old. It was alleged that J.A. threatened the person he deemed responsible for the weapon being located and confiscated.

In August 2020, a wardship petition was filed against J.A. after he was found in possession of a .380-caliber handgun. J.A. was accepted into a diversion program (deferred entry of judgment or DEJ). In 2020, the juvenile court ordered J.A. to undergo gang intervention training, counseling, and take drug and alcohol education classes.

On January 3, 2021, J.A. committed the alleged murder and attempted murder in this matter. This shooting involved a .40-caliber handgun, which J.A. sold to another gang member.

On or about March 26, 2021, law enforcement executed a search warrant at J.A.'s residence, where he resided with his mother. A .9-millimeter handgun was recovered in J.A.'s bedroom. As a result, a second wardship petition was filed against J.A. regarding his alleged possession of that firearm.

On August 6, 2021, J.A. and his mother were both arrested for their involvement in this fatal shooting, which involved a .40-caliber handgun. The present wardship petition (his third) was filed against J.A. on August 10, 2021.

During the transfer hearing, it was undisputed that J.A. had failed to previously participate in various programs and classes as ordered by the juvenile court in 2020 following his first wardship petition. However, the juvenile court received evidence which showed that, once a minor is put on deferred entry of judgment, the minor reports to probation and the minor is "linked to services." The court learned that, prior to the present fatal incident alleged in this matter, J.A. was never referred to juvenile services.

## IV.    The Juvenile Court Denies the Motion to Transfer.

After hearing all of the evidence and arguments from the parties, the juvenile court ruled that J.A. should be retained under the jurisdiction of the juvenile court. The court held that, based on all of the evidence, J.A. "should be retained within the jurisdiction of the Juvenile Court, because [the prosecution] has not met their burden by clear and convincing evidence." The court denied the motion to transfer J.A. to adult criminal court.

## V.    This Court Issues an Order to Show Cause.

Following the denial of the transfer motion, petitioner sought and obtained from this court a temporary stay of the proceedings below. Petitioner filed a Supplemental Petition for Writ of Mandate, contending the juvenile court abused its discretion.

On January 26, 2024, this court issued an order to show cause, and a briefing schedule was set. J.A. and petitioner filed briefs in response to the order to show cause.

On April 24, 2024, we granted an application for the Pacific Juvenile Defender Center (the Center) to file an amicus brief with us in support of J.A. Its amicus brief was deemed filed in this court that same day.

We turn to the merits of the petition for writ of mandate.

## DISCUSSION

Petitioner asserts that the juvenile court abused its discretion in denying the motion to transfer J.A. to adult criminal court.

13.

## I.    The Standard of Review.

An abuse of discretion standard is used to review a juvenile court's ruling on a motion to transfer a minor to adult criminal court.  The lower court's legal conclusions are reviewed de novo, but its factual findings are reviewed for substantial evidence. (*Kevin P. v. Superior Court, supra*, 57 Cal.App.5th at p. 187.)  When discretionary power is statutorily vested in the lower court, we will not disturb the court's decision on appeal unless the court exercised its discretion in an arbitrary, capricious or patently absurd manner.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse of discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

## II.    An Overview of the Applicable Law.

Several years ago, a minor could be transferred to adult criminal court if the petitioner established by a preponderance of the evidence that "the minor should be transferred to a court of criminal jurisdiction."  (Welf. & Inst. Code, § 707, former subd. (a)(3).)[6]  Effective January 1, 2023, the Legislature amended section 707, adding the following language:  "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)  This amendment raised the standard of proof and it required a new specific finding regarding amenability to rehabilitation.  (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284.)

The petitioner bears the burden of proof.  (Cal. Rules of Court, rule 5.770(a).)[7] The issue is not whether the minor committed the alleged acts.  Even a minor who is

---

[6]    All future statutory references are to the Welfare and Institutions Code unless otherwise noted.

[7]    All future citations to Rules are to the California Rules of Court unless otherwise noted.

charged with murder may remain under the jurisdiction of the juvenile court. (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 724.) The "ultimate question" for a juvenile court to decide is whether the minor is amenable to rehabilitation. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416; see also *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716, disapproved on another point in *People v. Green* (1980) 27 Cal.3d 1, 33–34.)

In making its decision, a juvenile court shall consider five criteria:

(1)     The degree of criminal sophistication exhibited by the minor;

(2)     Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction;

(3)     The minor's previous delinquent history;

(4)     The success of previous attempts by the juvenile court to rehabilitate the minor; and

(5)     The circumstances and gravity of the offenses alleged in the petition. (§ 707, subd. (a)(3)(A)-(E).)

Although a juvenile court must consider the five statutory factors specified above, the court is not required "to give equal weight" to each criterion and it may find "that one criterion outweighed the other criteria." (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1035.)

### III.     Petitioner's Arguments.

According to petitioner, the court's order is unsupported by substantial evidence and it is "based in large part on irrelevant considerations."

We reject petitioner's various assertions. After reviewing this record, it is apparent that petitioner did not meet its burden to prove by clear and convincing evidence that J.A. was not amenable to rehabilitation under the jurisdiction of the juvenile court. (§ 707, subd. (a)(3).) The juvenile court's order is based on substantial evidence and the court did not abuse its discretion.

We examine the five criteria and petitioner's specific arguments.

15.

### A. *The first factor.*

The first factor which the juvenile court considered was the "degree of criminal sophistication" which J.A. exhibited. (§ 707, subd. (a)(3)(A)(i).)

When evaluating this criterion in 2023, the court was permitted to give weight to any relevant factor, including, but not limited to:

(1) J.A.'s age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense;

(2) J.A.'s impetuosity or failure to appreciate risks and consequences of criminal behavior;

(3) The effect of familial, adult, or peer pressure on J.A.'s actions;

(4) The effect of J.A.'s family and community environment; and

(5) The existence of childhood trauma. (§ 707, former subd. (a)(3)(A)(ii).)[8]

When rendering its ruling, the court was aware of these considerations.

#### 1. *The court's findings.*

The juvenile court found that J.A. had been "one week shy" of turning 17 when the alleged offenses occurred. The court cited with approval Murphy's report and opinions. Murphy had concluded that J.A. was amenable to juvenile rehabilitation during the nearly six years remaining under juvenile jurisdiction. The court believed that Murphy's opinion was "supported by the brain neuroscience that is the foundation of Juvenile Justice reform." The court noted that it was "now accepted that the prefrontal cortex, which controls executive functions, decision making, impulse control, and forethought, is not fully developed in young adults."

The court emphasized J.A.'s repeated childhood trauma. The court stated it had not found any evidence showing parental guidance over J.A., or that his family had ever

---

[8] Effective January 1, 2024, Senate Bill No. 545 amended section 707 *to require* a juvenile court to consider these and other factors, *which were previously discretionary.* (See § 707, subd. (a)(3)(A)-(E).)

16.

been concerned for him. The court concluded that J.A. did not have a childhood but a "series of traumatic events over which he had no control." The court stated that J.A.'s "formative years were characterized by instability, substance abuse, and abusing adults, and a mother who, to this day, continues to sabotage his rehabilitation efforts."

The court reviewed the four recorded calls. The court noted that the prosecution had failed to allege in the juvenile petition that this fatal shooting had been committed to advance a gang objective. The court rejected petitioner's arguments that the four recorded calls showed J.A.'s "true intentions" to remain in the gang and commit additional crimes. The court cited with approval Murphy's opinion that J.A.'s mother was emotionally abusive and manipulative. According to the court, it was the mother who had agreed to connect the phone calls so J.A. could speak with other gang members. The court commented that its "mandated inquiry" was whether J.A. was amenable to treatment "under the structured environment of the JJC, not whether he has already rehabilitated while awaiting his transfer hearing."

The court recited the various juvenile programs that were available for J.A. The court held that J.A. was amenable to rehabilitation while under juvenile jurisdiction. It concluded that petitioner had failed to meet its burden of proof for this first criterion.

### 2. Petitioner's arguments.

Petitioner raises numerous concerns regarding how the juvenile court resolved this first criterion. According to petitioner, J.A. had a gang motive for this shooting, and the gang evidence should have had a "significant impact" on how the court viewed J.A.'s criminal sophistication. Petitioner contends that the juvenile court ignored the prosecution's gang evidence[9] and, instead, the court simply blamed J.A.'s mother.

---

[9] During the prima facie stage of the transfer hearing, the juvenile court heard from a detective, Felix Lara. Lara was a gang expert who testified about the Norteño gang, including the West Fresno Norteños. Lara explained to the court that members of J.A.'s gang have a "green light" to assault rival gang members when possible, including

Petitioner argues that J.A. exhibited criminal sophistication because he was an active gang member who armed himself for potential encounters, such as the one that occurred.

Petitioner notes that, after this shooting, J.A.'s mother assisted him. Petitioner asserts that the mother's assistance enhanced the degree of criminal sophistication for the alleged crimes.

Petitioner asserts that the juvenile court erred in its review of the four recorded calls. According to petitioner, J.A.'s calls show his sophistication because he was following the rules of the gang and ignoring the court's rules. Petitioner maintains that the court improperly blamed the calls on the mother and disregarded the fact that J.A. had directed his mother to make each call.

### 3. Petitioner's arguments are unpersuasive.

We reject petitioner's various arguments. Substantial evidence supports the juvenile court's conclusion that this criterion weighed in favor of keeping J.A. under the jurisdiction of the juvenile court.

Murphy's report details that J.A.'s brain is still developing due to his age. It is now understood that juvenile offenders had not fully developed cognitively. "Starting in early adolescence, rapid changes occur where increased decision-making, problem solving, and reasoning follow a period of increased risk taking and seeking of novel situations and experiences." Murphy's report also raises a concern that J.A.'s decisionmaking abilities, his judgment and coping skills are even more immature than normal due to his chronic use of cannabis and alcohol. Murphy opined that it was critical at this stage to strengthen "positive connections" for J.A. "by replacing old learning or habits with new, prosocial patterns of thinking and behavior." She opined that a structured environment could assist him to transition successfully into adulthood.

---

Bulldogs. According to Lara, attacks on rival gang members can elevate the status of members of J.A.'s gang.

There was no evidence that this crime was planned in advance. J.A. and I.L. did not know each other. I.L. confirmed to law enforcement that no words were exchanged before this fatal encounter.

Evidence exists that, just before the shots were fired, I.L. reached for his waistband. Although there is no evidence that I.L. pulled out a weapon, law enforcement later discovered that I.L. had a nonworking firearm in his waistband when this fatal encounter occurred. The evidence that I.L. may have reached for his waistband provides a possible explanation why J.A. drew his weapon and began firing.

Although J.A. was an active gang member and armed when this fatal incident occurred, the juvenile court had ample grounds to rule that petitioner did not establish by clear and convincing evidence that J.A. was criminally sophisticated such that he was not amenable to rehabilitation under the jurisdiction of the juvenile court.

By statute in 2023, the juvenile court was permitted to consider the effect of familial peer pressure on J.A.'s actions, the effect of his family and community environment, and the existence of childhood trauma. (See § 707, former subd. (a)(3)(A)(ii).) The record overwhelmingly supports the juvenile court's conclusion that J.A.'s family environment and his childhood trauma weighed against finding that J.A. had acted with criminal sophistication. Overwhelming evidence supports the juvenile court's findings that J.A. had a troubled childhood. The evidence amply supports the juvenile court's conclusions that J.A.'s mother was largely responsible for J.A.'s chaotic upbringing.[10] J.A.'s mother was a validated member of the Bulldogs criminal street gang. As Murphy opined, it is not surprising that J.A. went down the gang path.

---

[10] We note that, under the 2024 version of the statute, a juvenile court is now *required* to give weight to certain factors, including "the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; [and] the existence of childhood trauma." (§ 707, subd. (a)(3)(A)(ii).)

In briefing this particular factor, and indeed throughout its entire petition, petitioner points to alternative inferences which may be drawn from the evidence. Petitioner faults the juvenile court for how it weighed the evidence. For instance, petitioner contends that the court erred when it blamed J.A.'s mother for her role in the recorded calls, rather than finding fault with J.A. Petitioner asserts that the juvenile court "glossed over" the prosecution's evidence. Petitioner also argues that the court failed to consider a possible gang-related motive for this shooting. Petitioner maintains that the court erred in relying on Murphy's opinions about criminal sophistication. According to petitioner, Murphy incorrectly believed this fatal incident occurred due to sudden impulse. In contrast, petitioner contends that this conflict arose because J.A. was a "full-fledged" gang member who was armed, and it was reasonable he would come into contact with a perceived gang rival. Petitioner argues that, in going back to stand over I.L., J.A. showed sophistication because he was attempting to kill a rival gang member and a witness to his crimes.

Although petitioner can point to alternative ways in which the evidence may be viewed, such as how to interpret J.A.'s four recorded calls or why this fatal encounter occurred, those alternative viewpoints do not establish an abuse of discretion. We will neither reassess the credibility of the witnesses nor reweigh the evidence. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415; *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1221; *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622.) We have no authority to substitute our view of the evidence for that of the lower court. (See *Berkeley Cement, Inc. v. Regents of University of California* (2019) 30 Cal.App.5th 1133, 1140; *Brawley v. J.C. Interiors, Inc.* (2008) 161 Cal.App.4th 1126, 1137.)

The juvenile court was free to accept or reject the experts' various opinions. (See *In re Scott* (2003) 29 Cal.4th 783, 823 ["Although experts may testify about their opinions, the fact finder decides what weight to give those opinions."].) The prosecutor argued to the juvenile court why it should not find Murphy's opinions credible. It is

apparent that the court rejected the prosecutor's arguments. We will not second-guess how the juvenile court viewed the credibility of the various witnesses.

Finally, we need not fully address petitioner's remaining arguments regarding how the juvenile court resolved the first factor.[11] The evidence supports the juvenile court's determination that J.A. did not act with such criminal sophistication that he was not amenable to rehabilitation within the juvenile system. Substantial evidence supports the court's findings. The court's application of the law to the facts was not arbitrary, capricious or patently absurd. Accordingly, an abuse of discretion does not exist for this first factor.

### B. The second factor.

The second factor which the juvenile court considered was whether J.A. could be rehabilitated before the expiration of juvenile jurisdiction. (§ 707, subd. (a)(3)(B)(i).)

When evaluating this criterion, the court was permitted to give weight to any relevant factor, including, but not limited to, appellant's "potential to grow and mature." (§ 707, subd. (a)(3)(B)(ii).) When rendering its ruling, the court was aware of these statutory guidelines.

The focus of this second criteria is whether there is enough time to rehabilitate a minor while the minor is still eligible to remain under the jurisdiction of the juvenile court. (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 166; *J.N. v. Superior Court*, *supra*, 23 Cal.App.5th at p. 721.)

---

[11] According to petitioner, the juvenile court improperly relied on evidence from other criterion to resolve this factor. In addition, petitioner argues that the juvenile court improperly focused on a lack of parental guidance and concern exhibited by J.A.'s family. According to petitioner, the court improperly placed a burden on them to present evidence that was not required by law. Petitioner also contends that the juvenile court improperly relied on Murphy's opinions regarding gang culture. Petitioner asserts that Murphy's opinions were not supported by substantial evidence because she admitted that she was not a gang expert. Petitioner maintains that the court improperly focused on Murphy's opinion in finding fault with the mother.

### 1. The court's findings.

The court found that, at the time of the court's ruling, J.A. was 19 years three months old. The court noted that, if J.A. was considered for commitment to the secure youth treatment facility, he would be committed "for a baseline term of four to seven years."

According to the court, the probation officer had concluded "without support" that J.A.'s rehabilitative needs far surpassed the juvenile resources available. The probation officer "did not articulate the needs" that J.A. had, "which were known at the time of the probation officer's investigation." The court also raised concern that the probation officer's report had faulted J.A. for not previously completing programs, but, when testifying, the probation officer had conceded that J.A. was not referred for services. The court concluded that, even if J.A. had been referred for services, it was "unlikely that he would have had the guidance and support to enroll and complete the programs" based on the evidence of "child abuse and neglect." The court noted that the probation report failed to account for J.A.'s conduct and educational achievements while in custody, and the report failed to address J.A.'s past traumatic experiences, which were documented by CPS.

The court outlined the various programs available to J.A. The court noted it had received testimony that J.A. "has always been respectful, attentive, and willing to participate in his classes at JJC." J.A. was "receptive to correction."

The court acknowledged J.A.'s four recorded phone calls and the prosecution's arguments that, based on those calls, J.A. was not amenable to rehabilitation and he had no intention of cutting ties to his gang. The court noted that three of these calls had occurred while the transfer hearing was ongoing. The court cited with approval the testimony from Woodruff that these recorded calls validated J.A's trauma, which had contributed to J.A.'s gang membership. The court noted that Advance Peace "can help

[J.A.] make the transition to his community by providing legitimate ways to earn money, and rechanneling the rap abilities that he displayed in the calls via positive outlets."

The court acknowledged that J.A.'s four recorded calls "belie his commitment to rehabilitation." However, the court also believed that "intensive counseling and gang redirection" will address and deter his current interests. The court believed that J.A. has the potential to grow and mature because his "brain is still in a period of developmental plasticity that bodes well for his rehabilitation." The court concluded that J.A. may be rehabilitated during the nearly six years remaining of juvenile jurisdiction. The court held that petitioner had not met its burden for this factor by clear and convincing evidence.

### 2.    *Petitioner's arguments.*

According to petitioner, the juvenile court's findings for this criterion were not supported by the record and were contrary to the evidence. Petitioner asserts that J.A. cannot be rehabilitated before the expiration of juvenile jurisdiction and this factor weighs in favor of transfer.

Petitioner maintains that the court erred in failing to give greater weight to the substance of J.A.'s four recorded calls. Petitioner insists that J.A.'s calls show his true intent, which is to continue committing crimes for his gang. According to petitioner, the court erred in focusing on the mother's actions because J.A. was the one who manipulated both his mother and the court. Petitioner argues that the timing and content of the recorded calls show why J.A. cannot be rehabilitated in the remining time under juvenile jurisdiction. According to petitioner, J.A.'s good behavior while in custody and his programming to date had no actual rehabilitative effect on him.

Petitioner asserts that the juvenile court disregarded evidence that shows the secured youth treatment facilities have limited success.[12] Petitioner also contends that

---

[12]    The court learned that the County's secure youth track facility had, to date, a total of 13 minors and former minors, and two had been released. One of those released had

23.

the evidence does not support the court's finding that J.A.'s mother was emotionally abusive and manipulative. According to petitioner, it was J.A. who was directing his mother to make the illegal calls.

Finally, petitioner argues that the juvenile court failed to consider J.A.'s age, his commitment and active participation as a gang member, and his potential for adult prosecution and adult penalties in making his recorded calls. According to petitioner, these factors should weigh in favor of transfer.

### 3. *Petitioner's arguments are unpersuasive.*

Petitioner's numerous arguments are unpersuasive. Substantial evidence supports the court's conclusion that J.A. could be rehabilitated before the expiration of juvenile jurisdiction. (§ 707, subd. (a)(3)(B)(i).)

The record amply demonstrates that programs are available which can address J.A.'s particular needs. The defense experts made it clear that J.A. was amenable to rehabilitation. Given that J.A. had nearly six more years remaining under juvenile jurisdiction, the court acted well within its broad discretion in concluding that this factor did not weigh in favor of transfer.

We decline petitioner's invitation to reweigh the strength of the evidence, including how to view the four recorded calls. Although petitioner can point to other inferences which may be drawn from J.A.'s calls, those adverse inferences do not demonstrate an abuse of discretion. To the contrary, the court was free to give whatever weight it deemed relevant to such evidence, which we will not disturb on appeal.

Finally, the probation officer failed to articulate what J.A. needed for rehabilitation, and the officer made no effort to articulate what juvenile resources were available for J.A. We discern no abuse of discretion when the court rejected the recommendations of the probation officer.

---

been returned on a violation. As such, and at that time, the secure youth track had a recidivism rate of 50 percent.

The juvenile court had sufficient grounds to conclude that petitioner failed to meet its burden to establish by clear and convincing evidence that J.A. could not be rehabilitated in the remaining time under juvenile jurisdiction. Substantial evidence supports the court's findings, and its application of the law to the facts was not arbitrary, capricious or patently absurd. Accordingly, an abuse of discretion does not exist for this second criterion.

### C. *The third factor.*

The third factor which the juvenile court considered was J.A.'s previous delinquent history. (§ 707, subd. (a)(3)(C)(i).) When evaluating this criterion, the court was permitted to give weight to any relevant factor, including, but not limited to, the seriousness of J.A.'s previous delinquent history. The court was also directed to consider the effect of J.A.'s family and community environment, and childhood trauma on his previous delinquent behavior. (§ 707, subd. (a)(3)(C)(ii).)

When rendering its ruling, the court was aware of these guidelines.

### 1. *The court's findings.*

The court found that J.A. had two prior juvenile adjudications. When he was 16 years old, J.A. was adjudged a ward of the court following his admission to possession of a firearm. In September 2020, J.A. was granted deferred entry of judgment and ordered to serve 75 days on GPS. He was also ordered to complete individual and family counseling, gang redirection, and alcohol and drug education classes. J.A. did not complete the court-ordered programs.

On March 26, 2021, and while on deferred entry of judgment, J.A. was arrested in possession of another firearm. The court found that J.A. was residing with his mother in her home when this occurred. The court noted that, on April 22, 2021, J.A. admitted the second firearm possession offense and he was adjudged a ward of the court. He was ordered to serve 80 days in the juvenile justice campus, and 30 days on GPS. He was also ordered to engage in individual counseling and gang redirection programs.

25.

The court held that J.A. had not previously received juvenile services. The court further held that, even if he had previously received such services, "the negative influences of his family, and especially his mother," served to "encourage and condone" J.A.'s delinquent behavior. The court stated it had considered for this factor J.A.'s familial environment, his community, and his childhood trauma.

The court held that J.A.'s mother's "malignant influence" contributed to J.A.'s delinquency, even during the transfer hearing. According to the court, the mother "facilitated" the four recorded calls between J.A. and other gang members. The court agreed with Woodruff's assessment that J.A.'s mother "was the architect of all the misery in his life." The court held that petitioner had not met its burden regarding this factor by clear and convincing evidence.

### 2. *Petitioner's arguments.*

Petitioner contends that the juvenile court erred in failing to consider that J.A. did not take any steps to engage in prior juvenile services. According to petitioner, J.A. failed to engage in previous services because he was out of custody so he had no motivation to do so. Petitioner also argues that the court improperly found fault with the mother, and the court failed to consider the prior offenses, all of which involved possession of different firearms, including a sawed-off shotgun. Petitioner asserts that the court improperly focused on the mother to explain why J.A. possessed a firearm on three separate occasions.

Petitioner maintains that J.A. possessed firearms and he was an admitted gang member. According to petitioner, J.A.'s prohibited firearm possessions show that this murder and attempted murder were not a crime of opportunity or of rash behavior. Petitioner contends that the juvenile court ignored J.A.'s entrenchment and devotion to his criminal street gang. Petitioner again asserts that J.A.'s recorded calls show his true intentions, which proves he cannot be rehabilitated.

### 3. Petitioner's arguments are unpersuasive.

Petitioner's assertions for this criterion lack merit. We again decline to reweigh the evidence. Although petitioner can articulate other inferences which may be drawn from the record, we will not disturb how the court viewed the strength of the evidence.

Although J.A. has a history of possessing firearms, his prior delinquent behavior does not demonstrate by clear and convincing evidence that he is not amenable to rehabilitation. The court was permitted to weigh the impact of J.A.'s family and community environment, and his childhood trauma. (§ 707, subd. (a)(3)(C)(ii).) The record supports the court's findings that J.A.'s prior delinquent behavior was a product of his environment and family dynamics.

We do not discern an abuse of discretion regarding how the court resolved this criterion. The court acted within its broad discretion in concluding that the prosecution did not establish by clear and convincing evidence that J.A.'s prior adjudications showed he was not amenable to rehabilitation.

### D. The fourth factor.

The fourth factor which the juvenile court considered was the success of previous attempts to rehabilitate J.A. (§ 707, subd. (a)(3)(D)(i).) When evaluating this criterion, the court was permitted to give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address J.A.'s needs. (§ 707, subd. (a)(3)(D)(ii).) When rendering its ruling, the court was aware of these guidelines.

### 1. The court's findings.

For this factor, the juvenile court concluded that the timing of J.A.'s prior juvenile adjudications did not permit for any services or programs to commence. According to the court, J.A.'s mother "has condoned and promoted" his delinquent behavior. The court found that the mother "continues to undermine" J.A.'s rehabilitation "by normalizing his delinquent behavior, instead of providing positive guidance and encouraging his education."

27.

The court stated that J.A. has "benefitted from JJC's structured environment and programs. He has graduated from high school and has enrolled in a college course." According to the court, J.A. has "excellent prospects for rehabilitation" during the period of juvenile jurisdiction because he is away "from his family's and community's harmful influence." The court held that petitioner had not met its burden to prove this factor by clear and convincing evidence.

### 2.     Petitioner's arguments.

According to petitioner, the juvenile court improperly focused on J.A.'s mother. Petitioner contends that the court's finding that the mother condoned and promoted J.A.'s delinquent behavior "belies the evidence on the record." Petitioner argues that the court failed to address the content of the recorded calls which J.A. had with gang members. Petitioner maintains that those calls show J.A.'s continued commitment to his gang. Petitioner asserts that the court's findings in this criterion were not supported by substantial evidence, and this factor weighs in favor of transfer.

### 3.     Petitioner's arguments are unpersuasive.

During the transfer hearing, it was undisputed that J.A. had failed to previously participate in various programs and classes as ordered by the juvenile court in 2020 following his first wardship petition. However, the juvenile court received evidence which showed that, once a minor is put on deferred entry of judgment, the minor reports to probation and the minor is "linked to services." The court learned that, prior to the present fatal incident alleged in this matter, J.A. was never referred to juvenile services. As such, this record amply supports the juvenile court's findings.

We decline to reassess the weight of the evidence. The juvenile court acted well within its discretion when it ruled that the prosecution failed to prove this factor by clear and convincing evidence. (§ 707, subd. (a)(3)(D)(i).) Accordingly, an abuse of discretion is not present for this criterion.

### E. *The fifth factor.*

The fifth factor which the juvenile court considered were the circumstances and gravity of the alleged offenses. (§ 707, subd. (a)(3)(E)(i).) When evaluating this criterion, the court was permitted to give weight to any relevant factor, including, but not limited to, J.A.'s actual behavior, his mental state, his degree of involvement in the crimes, the level of harm he actually caused, and his "mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).) When rendering its ruling, the court was aware of these guidelines.

#### 1. *The court's findings.*

When evaluating this fifth criterion, the juvenile court found that I.L. was carrying a nonworking firearm at the time of the incident. According to the court, J.A.'s "escalating delinquency, characterized by his unrelenting gun possession, set in motion the horrific events that led to [Breanna's] senseless death and [I.L.'s] gunshot injuries." The court concluded that petitioner had met its burden for this factor, which weighed in favor of transferring J.A. to adult court.

#### 2. *Petitioner's arguments.*

Petitioner acknowledges that the juvenile court found that this factor weighed in favor of transfer. However, petitioner argues that the court failed to discuss that J.A. shot both victims and then stood over I.L. and fired until his firearm was empty. According to petitioner, substantial evidence supports this factor and the court's decision that this criterion weighed in favor of transfer.

#### 3. *This factor weighs in favor of transfer.*

The circumstances and gravity of the charged offenses are such that we agree with petitioner and the juvenile court that this factor weighs in favor of transfer. J.A. caused horrific harm when he ended Breanna's life prematurely. He also shot I.L. multiple times in a manner that was shocking. The juvenile court did not abuse its discretion regarding this criterion.

29.

**IV. Under the Totality of the Circumstances, the Juvenile Court did not Abuse its Discretion.**

Petitioner insists that substantial evidence supports all five factors and the juvenile court should have granted the motion to transfer J.A. to adult criminal court. Petitioner asks us to issue a writ of mandate wherein we direct the juvenile court to vacate its order denying the prosecution's transfer motion and enter an order granting the motion. We deny the requested relief.

The juvenile court ruled that J.A. was amenable to rehabilitation while under the jurisdiction of the juvenile court. (§ 707, subd. (a)(3).) The court held that petitioner had failed to meet its burden to establish by clear and convincing evidence that J.A. was not amenable to rehabilitation. After reviewing the entire record, we find no abuse of discretion.

At the time of this transfer hearing, J.A. was just over 19 years old. As such, the juvenile court had almost six years remaining to exercise jurisdiction over him. (§ 607, subd. (c).)

The record demonstrates that J.A. was doing well in his juvenile programs and classes. He had graduated from high school and he had enrolled in a college course. He had won various awards and certificates, including student of the month in his pod. He did not have behavioral concerns. The record supports the juvenile court's finding that, when he is separated from his family's and community's harmful influences, J.A. has an opportunity for rehabilitation.

Contrary to petitioner's numerous arguments on appeal, J.A.'s four recorded calls do not establish that the juvenile court abused its discretion. The court considered what weight to give those calls. The court was permitted to determine that the calls did not establish by clear and convincing evidence that J.A. was not amenable to rehabilitation. We will not interfere with how the court weighed such evidence.

Petitioner repeatedly argues throughout its petition that the juvenile court erred when it relied on the defense experts' various opinions. Petitioner focuses particularly on

30.

Murphy's testimony, contending her opinions lack credibility and were "defective." Petitioner notes that Murphy was not an expert on criminal street gangs, a fact which she admitted while testifying. Petitioner asserts that Murphy's view of the fatal shooting was unreasonable because she did not understand the gang lifestyle, she failed to recognize that J.A. may have been armed that night for offensive purposes, she failed to acknowledge that J.A. may have intentionally attacked a rival gang member, and she failed to account for J.A.'s actions after the shooting, such as disposing of his firearm.[13]

Petitioner also contends that Murphy's and Woodruff's views of the four recorded calls were unreasonable. Petitioner asserts that Murphy unreasonably blamed the mother for those calls, and Murphy failed to acknowledge J.A.'s role in manipulating both the court and his mother. Petitioner argues that Woodruff incorrectly used the recorded calls to discuss J.A.'s trauma.

Based on concerns such as these, petitioner argues that the defense experts' opinions, especially from Murphy, do not represent substantial evidence. According to petitioner, the defense's underlying view of the evidence was flawed so that the juvenile court's ruling is an abuse of discretion.

We find these arguments unpersuasive. During the transfer hearing, petitioner cross-examined the defense experts. Petitioner argued to the juvenile court why it should give little or no weight to the defense experts' opinions, especially from Murphy.

As the finder of fact, the juvenile court was free to decide what weight, if any, to give to experts' opinions. The court heard for itself the circumstances surrounding this fatal incident. The court listened to the four recorded calls. The court was in the best position to resolve the question of witness credibility and to judge the reasoning of the

---

**13** Murphy testified that J.A.'s fatal shooting appeared to have been impulsive and unplanned. She believed that J.A. had carried a gun ostensibly for protection, which was "an unfortunate reality" for gang members. She testified that there was no indication of an altercation prior to this fatal shooting, and she believed a gesture from I.L. was likely taken as a threat.

31.

various experts. It was the court's ultimate task to decide whether or not J.A. was amenable to rehabilitation. (See *In re E.P.*, *supra*, 89 Cal.App.5th at p. 416; see also *People v. Chi Ko Wong*, *supra*, 18 Cal.3d at p. 716.) Based on its rulings, it is apparent that the court rejected petitioner's assertions regarding how it should view the credibility of the expert witnesses. We will not disturb the court's credibility determinations and we reject petitioner's claim that the defense experts' various opinions do not represent substantial evidence.

It is clear that J.A. is a very troubled youth. He was an active gang member who was armed when this fatal incident occurred. J.A.'s alleged conduct was horrific and shocking. It is apparent that, if he has any hope of rehabilitating, he will need substantial mentoring and counseling. This record establishes that programs are available which may address J.A.'s needs, including his ongoing commitment to his gang. The court was justified in rejecting the probation officer's unsubstantiated assertion that J.A.'s "rehabilitative needs surpass the available resources accessible" to him through the juvenile system. Indeed, during closing argument, the prosecutor admitted to the juvenile court that the probation officer "did not have a lot of information and did not acquire as much information as I would have liked and I think this Court would have liked …."

A different juvenile court may have weighed the evidence differently and reached a contrary ruling. However, that does not establish an abuse of discretion. The juvenile court here was not required "to give equal weight" to each criterion and it was permitted to find "that one criterion outweighed the other criteria." (*C.S. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 1035.) The totality of the record supports the juvenile court's ruling that petitioner failed to meet its burden of proof by clear and convincing evidence. Substantial evidence supports the court's findings that J.A. was amenable to rehabilitation. The court's application of the law to the facts was neither arbitrary, capricious nor patently absurd. Accordingly, an abuse of discretion is not present. Petitioner's arguments lack merit, and we will deny this petition for writ of mandate.

**V. We Need Not Resolve Whether Rule 5.770 Imposes an Additional Finding before a Juvenile Court may Transfer a Minor to Adult Criminal Court.**

Rule 5.770 provides guidance to a juvenile court regarding how to resolve a motion to transfer a minor to adult criminal court. Effective September 1, 2023, rule 5.770 was amended regarding the criteria a juvenile court must consider before it may order a youth transferred. Under this rule, a juvenile court must find by "clear and convincing evidence" each of the following:

(1) The minor was 16 years or older at the time of any alleged felony offense, or the minor was 14 or 15 years of age at the time of an alleged felony offense listed in section 707, subdivision (b), and was not apprehended prior to the end of the juvenile court jurisdiction; and

(2) The minor should be transferred to the adult court based on an evaluation of the five criteria under section 707, subdivision (a)(3)(A)-(E); and

(3) The minor "is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Rule 5.770(b)(1)-(3).)

Based on the language in rule 5.770, J.A. argues a juvenile court is required to make a "third finding" before transferring a minor to adult criminal court. J.A. contends that juvenile courts should still consider the five statutory criteria, but a court must also make a separate determination that a minor is not amenable to rehabilitation before the minor may be transferred. J.A. asserts that "whether a minor is amenable to rehabilitation is a broader standard that precludes transfer even if a minor cannot be fully rehabilitated prior to the expiration of juvenile jurisdiction."

In its amicus brief, the Center argues that, based on the amendments to rule 5.770, a juvenile court must specifically determine a minor's amenability to rehabilitation. According to the Center, "unless the prosecution can establish the minor is *not* amenable by clear and convincing evidence, the juvenile court cannot transfer the minor to a court of criminal jurisdiction, regardless of how it views the other enumerated factors." The Center contends that rule 5.770 allows transfer only if the juvenile court finds by clear

and convincing evidence that both (1) the minor should be transferred in light of the five statutory criteria and (2) the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.

Based on this record, we need not further address either J.A.'s or the Center's concerns in this regard. At the time of its ruling, the juvenile court stated that the prosecution bore the burden of proof to establish by clear and convincing evidence that J.A. was not amenable to rehabilitation while under the jurisdiction of the juvenile court. The court understood it was required to weigh the five statutory factors. After hearing the evidence and the arguments, the court ruled that the prosecution had failed to meet its burden of proof, and it denied the motion to transfer.

This record amply demonstrates that the juvenile court complied with the requirements under the Welfare and Institutions Code. (See § 707, subd. (a)(3).) We have already held that the court did not abuse its discretion in denying the transfer motion. Consequently, there is no need to delve further into J.A.'s and the Center's assertions regarding what additional requirements, if any, rule 5.770 imposes on a juvenile court before a minor may be transferred to adult criminal court.

## DISPOSITION

The order to show cause is discharged, and the petition for writ of mandate is denied.

LEVY, Acting P. J.

WE CONCUR:


DETJEN, J.


PEÑA, J.

34.